## GRUBBS v. INGALLS IRON WORKS CO.
### No. 5671.

District Court, N. D. Alabama, S. D.
June 19, 1946.

John D. Hill, U. S. Atty., and William H. Burton, Jr., and W. R. Bradford, Asst. U. S. Attys., all of Birmingham, Ala., for plaintiff.

Lange, Simpson, Robinson & Somerville, Reid B. Barnes, and D. W. Strickland, all of Birmingham, Ala., for defendant.

LYNNE, District Judge.

Petitioner is an employee of The Ingalls Iron Works Company, a corporation. He entered its employ on the second day of February, 1942, and worked for it at its Southside Plant in the city of Birmingham, Alabama, in the capacity of Layerout, first class, on the first shift (hereinafter referred to as the day shift) until he was inducted into the Navy on the fifteenth day of May, 1943. He served in the Navy until the thirtieth day of September, 1944, on which date he was honorably discharged and received a certificate to that effect. On the ninth day of October, 1944,

at which time he was still qualified to perform the duties of a Layerout, first class, he applied to the respondent corporation, as was his right under the Selective Training and Service Act of 1940, 54 Stat. 885, 50 U.S.C.A.Appendix, § 301 et seq.; for restoration to his former position. He was directed by an authorized personnel officer of respondent to report to respondent's Southside Plant on the sixteenth day of October, 1944, for work on the day shift in his former capacity.

Between the ninth and sixteenth days of October, 1944, petitioner informed the Superintendent of respondent's Southside Plant of the directions he had received from respondent's personnel officer and was told by said Superintendent that he would not restore petitioner to work on the day shift but would place him on the second shift (hereinafter referred to as the night shift) on the sixteenth day of October, 1944. Thereafter, petitioner did not report for work on the latter date and remained without employment until the first day of November, 1944, when he was reemployed by respondent as a Layerout, first class, on the day shift.

Thereupon, petitioner brought this suit, pursuant to Section 8(c) of the Act, to obtain a declaratory judgment as to his rights under the Act and to obtain compensation for the fourteen days he was not allowed to work, of which action this Court has jurisdiction. Respondent answered, justifying its action on the grounds that petitioner was a temporary employee within the exception provided in Section 8(b) of the Act; that he was reemployed in his former position within a reasonable length of time, and that its offer to reemploy him as a Layerout, first class, on the night shift, commencing on the sixteenth day of October, 1944, constituted a bona fide offer to restore him to his former position or to a position of like seniority, status and pay within the contemplation of Section 8(b) (B) of the Act.

At all times material to this suit, petitioner was a member of Shopmen's Local No. 539 of the International Association of Bridge, Structural and Ornamental Iron Workers, Birmingham, Alabama, which union was the bargaining agency for the shop employees of respondent corporation, and had in effect with respondent, at all times material to this action, valid collective bargaining agreements. Under the terms of such contracts and under the classification and seniority schedules, published by respondent and approved by the union thereunder, petitioner is shown to have acquired a seniority classification as a Layerout, first class, with respondent as of the twenty-fourth day of February, 1942.

There is no provision in the collective bargaining agreement in effect either on the date of petitioner's induction into the Navy or on the date of his application for reemployment which recognizes that preference of assignment to either the day or night shift is an incident of seniority. It appears from the evidence that on each of said dates respondent had the unqualified right to assign its employees either to the day shift or to the night shift, irrespective of their seniorities or individual desires in the matter. There was no differential in the pay of Layersout, first class, assigned to the day shift and those assigned to the night shift.

Petitioner attributes his preference for assignment to the day shift to several factors. He resided more than eight miles from respondent's plant and, at the conclusion of work on the night shift, transportation to his home was both slow and uncertain, since he had sold his car when he was inducted into the service and was entirely dependent upon public conveyances. The duties of his position required the constant reading of blue prints and the artificial lights in respondent's plant were hard on his eyes. Finally, his nervous system had been upset by his service in the Navy and he could obtain more refreshing rest by sleeping during the hours of the night than during those of the day.

On the sixteenth day of October, 1944, there was at least one Layerout, first class, assigned to the day shift who was inferior in seniority to petitioner, who was never inducted into the armed services, and who was assigned to the night shift on the date of petitioner's induction. Upon the reemployment of petitioner and his assignment to the day shift on the first day of November, 1944, such other employee was reas-

signed to the night shift. Shortly thereafter, he left respondent's employ, presumably as a protest against such reassignment.

It was stipulated by the parties upon the trial of this cause that if petitioner is entitled to a recovery in this action, the amount of compensation for the fourteen days involved herein would be $133.81.

On the eleventh day of February, 1942, within a few days after the date of his original employment, petitioner was required to sign a written acknowledgment that he was hired solely on a temporary basis and that he would not be entitled to seniority rights enjoyed by regular employees.

The contention that petitioner held a temporary position with respondent immediately prior to his induction into the Navy, and is therefore precluded from the benefits of the Act because of the exception established by Section 8(b) thereof, is without merit. The evidence establishes that his employment in the same classification was continuous from the second day of February, 1942, to the date of his induction, the fifteenth day of May, 1943. Under the terms of the collective bargaining agreements and the seniority schedules published by respondent in conformity therewith, which inured to petitioner's benefit, the character of his employment as other than temporary was definitely established. His written acknowledgment of the temporary nature of his employment shortly after its inception does not detract from the factual relationship established both by the conduct of the parties and the admissions of the employer.

The vital question in this case is whether an employee, who was assigned to work on the day shift of an industrial corporation when inducted into the active military service of the United States, has the right to insist upon restoration to the day shift following his honorable discharge from such service or does the employer discharge the duty imposed upon it by Section 8(b) of the Act when it offers to reemploy such employee in his former classification and assigns him to the night shift without affecting either his pay or his seniority.

This question invokes a construction of Section 8(b) of the Act. More specifically, it is the duty of the Court to interpret the intention of the Congress in its guarantee to the honorably discharged veteran that he shall be restored to the position which he left when he entered the military service of his country or to a position of like status. While the word "status" is not to be isolated from its context, it must be taken into account in attempting to define the boundaries of veterans' rights upon their return to civil occupations.

Recently, the Supreme Court, in the case of Fishgold v. Sullivan Drydock & Repair Corporation, 66 S.Ct. 1105, 1111, had occasion to consider the nature of the guarantee against discharge contained in Section 8(c) of the Act. While the precise point decided therein involved the seniority rights of the veteran, and a delineation of the difference in legal consequences between a "lay-off" and a discharge, it was pertinent for the Court to proceed to an analysis of all the guarantees contained in Section 8(b). As I understand the opinion, the Court held that the Congress intended to make "the restoration as nearly a complete substitute for the original job as was possible," and to insure the veteran against a severance of the employer-employee relationship as formerly constituted, by act of the employer, within one year after such restoration. Said the Court: "The 'position' to which the veteran is restored is the 'position' which he left plus cumulated seniority."

This legislation had for its purpose the raising of an army from the civilian population of the nation. Cognizance of the social dislocation which is an inevitable consequence of armed conflict motivated the Congress to act to preserve the inducted soldier's status quo ante bellum. It was manifestly impossible to foresee and guard against the changes and fluctuations which are inherent in our complex industrial economy. But it was imperative to bolster and to sustain the morale of troops who suddenly had been torn from their vocations, whose careers had been interrupted during their most productive years and who would, for the period of their active

duty, be deprived of war-distended wages. The considerations, which impelled the Congress to act, likewise require a liberal construction of this legislation. It is not a proper function of the courts to emasculate the provisions of remedial legislation because of difficulty in recalling an intent inspired by the urgency of a national emergency.

Neither the Committee Report of the Senate nor the account of the proceedings on the floor of the House, during the course of which the section of the Act here under consideration was substantially amended, affords real assistance upon the point of this inquiry. The language employed in the Act to insure the returning veteran against diminished pay and loss of seniority is adequate to convey the legislative intention. The use of the word "status" presents more difficulty. It is conceivable that it was adopted deliberately to include all benefits, tangible and intangible, other than pay and seniority, which flowed to the employee from his relationship with his employer at the time of his induction into the military service. The difficulty in applying so nebulous a guarantee with even-handed justice, which must have been apparent even in a time of crisis, militates against such a construction. Moreover, the juxtaposition of the term to the words "seniority" and "pay", which are descriptive of well-recognized incidents of contracts of industrial employment, is significant.

■■ It is my considered opinion that this legislation was designed to protect the rights of the veteran which he had at the time of his entry into the service and to preserve them for one year after his restoration thereto. His rights must be derived under his contract of employment, upon full consideration of all the express and implied conditions thereof, under a contract which inures to his benefit, such as a collective bargaining agreement, and under laws and regulations which operate thereupon (including the Act now under consideration). Thus it would appear that the rights of both the veteran and the employer, at the instant of restoration of the former, are identical with those which inhered in their relationship at the instant of his in-

duction, plus the guarantee against discharge or its equivalent within one year thereafter. I am unable to find any language in the Act which would justify the Court to infer that the Congress intended to confer rights above and beyond these.

■ Under the evidence in this case I am bound to conclude that the defendant offered to restore petitioner to all of the rights to which he was entitled at the time of his induction. Neither his own contract of employment nor the union contract conferred upon petitioner the right to work on the shift of his choice at the time of his induction. Indeed, the testimony is undisputed that, at all times material to this action, the defendant had the unqualified right to assign employees of petitioner's classification to either day or night shift at will. To hold that assignment to the day shift involved a "status" to which petitioner was entitled to be restored would accord a significance to that word entirely out of proportion to the obvious meaning of "pay" and the Supreme Court's definition of "seniority." To hold that petitioner was entitled to be restored to the day shift would necessitate a holding that his reassignment to the night shift at any time within one year thereafter would operate as a discharge within the prohibition of the Act from the position which he held at the time of his induction. Such reasoning would result in the Court's writing a new contract between the parties, whereas the Act, as construed by the Supreme Court in the Fishgold case, supra, recognizes the former contract as the test and, in effect, provides that it shall continue as though it had never been interrupted by the war (of course, with the added guarantee against discharge within one year).

It is important to note that the decision of this case in favor of the defendant is rested upon its own peculiar facts. I have made no effort to generalize upon my construction of the word, "status," as applied to the evidence before the Court. It will be necesssary to examine the contractual relationship and the pertinent circumstances involved in each case as it arises.

■ A discussion of petitioner's prayer for a declaratory judgment is pretermitted

since the conclusions expressed herein are adverse to petitioner's contention that he was wrongfully withheld from his former position for a period of fourteen days. Moreover, this aspect of the case, upon its submission for final judgment, was rendered moot, because the period of one year since the date of his restoration to the day shift had then expired.

### Findings of Fact and Conclusions of Law.

The findings of fact and conclusions of law are as they appear in the foregoing opinion.

### Judgment.

It is ordered and adjudged that plaintiff shall have and recover nothing against the defendant herein; the complaint is dismissed and the defendant shall go hence without day.